# In the United States Court of Federal Claims
## No. 11-201 C

(E-Filed Under Seal:  February 26, 2013)
(Reissued for Publication:  March 13, 2013)[1]

_____

|  |  |  |
|---|---|---|
| ROSS-HIME DESIGNS, INC., | ) | |
| | ) | RCFC 26(c); Protective Order; |
| Plaintiff, | ) | Motion for Access to Protected |
| | ) | Information; Proprietary |
| v. | ) | Information; Competitive |
| | ) | Decision-Maker; Restricted |
| THE UNITED STATES, | ) | Information; Export Controls |
| | ) | |
| Defendant. | ) | |

_____

Vytas M. Rimas, Minneapolis, MN, for plaintiff.

Conrad J. DeWitte, Jr., Patent Attorney, with whom were Stuart F. Delery, Principal
Deputy Assistant Attorney General, and John Fargo, Director, Commercial Litigation
Branch, Civil Division, United States Department of Justice, Washington, DC, for
defendant.  Kurt G. Hammerle, Intellectual Property Attorney, Office of the Chief
Counsel, NASA Johnson Space Center, Houston, TX, of counsel.

## OPINION AND ORDER

HEWITT, Chief Judge

I.      Background

        Ross-Hime Designs, Inc. (plaintiff or Ross-Hime), a Minnesota corporation
specializing "in the design and prototyping of humanoid robotic systems," brings this suit
alleging that two robotic manipulators known as Robonaut 1 and Robonaut 2, which were
developed by the United States (defendant or the government) acting through the

_____

[1] This Opinion and Order was originally filed under seal. The parties were given until
March 12, 2013 to submit their requests for proposed redactions.  Defendant filed a notice on
March 11, 2013 stating that no redactions were requested by the government.  See Notice by
Def. Regarding Redactions of the Ct.'s Feb. 26, 2013 Op., Docket Number (Dkt. No.) 69.  No
request for redactions has been received from plaintiff.  Accordingly, the court reissues this
Opinion and Order for publication without any redactions.

National Aeronautics and Space Administration (NASA), infringe on its patents.  Compl., Docket Number (Dkt. No.) 1, ¶¶ 1-7, 21-22, 25-26.

This case is subject to a protective order, which categorizes protected information as "restricted" (Restricted Information) or "proprietary" (Proprietary Information) or both.  See Order of Oct. 24, 2011 (Protective Order), Dkt. No. 14, ¶¶ 7-9.  The Protective Order defines Proprietary Information as information "that contains trade secrets, technical know-how, commercial or financial information, other business data, or any other information that at the time the information is requested is maintained in confidence or in which the party or Supplying Owner maintains a proprietary interest."  Id. ¶ 8.  The Protective Order defines Restricted Information as information "of a sensitive but unclassified nature in the possession of, or under the control of, the United States Government, . . . which may not be accessed or disclosed except pursuant to federal law and regulations."  Id. ¶ 7.  Restricted Information, for example, includes "information that may not be exported lawfully without approval, authorization, or license."  Id.

Pursuant to the Protective Order, Mark E. Rosheim (Mr. Rosheim), the president of Ross-Hime, may access only "Restricted Information that is not also identified as Proprietary Information."  Id. ¶ 10.  Plaintiff now seeks access for both Mr. Rosheim and plaintiff's outside draftsman, Michael Joachim (Mr. Joachim) to "accused structure descriptions, drawing[s] and photographs" related to Robonaut 2 and identified by NASA as both Restricted Information and Proprietary Information.  Pl.'s Mot. for Relief from Protected Info. Designation as to Def.'s Robonaut 2 Accused Structure Drawings & Photographs (plaintiff's Motion or Pl.'s Mot.), Dkt. Nos.[2] 45-46, at 1.  In particular, plaintiff requests that Mr. Rosheim be given access to certain protected CAD drawings and photographs of Robonaut 2 because, plaintiff alleges, "Mr. Rosheim was not provided with an opportunity to inspect [a display at the 2012 Institute of Electrical and Electronics Engineers International Conference on Robotics and Automation (ICRA 2012) involving an assembly of the Robonaut 2 hand, referred to by the parties as the hand-in-space or] the space hand."  Pl.'s Reply in Supp. of Mot. for Relief from Protected Info. Designation as to Def.'s Robonaut 2 Accused Structure Drawings & Photographs (plaintiff's Reply or Pl.'s Reply), Dkt. No. 62, at 2.  "Consequently, Mr. Rosheim seeks the opportunity to inspect the CAD drawings and photographs of the accused structure in lieu of the space hand model."  Id.

---

[2] Because the documents submitted by the parties contain a number of exhibits, some of the documents were too large to be filed as single docket entries.  Appendix E of the Rules of the United States Court of Federal Claims (RCFC), which governs electronic cases such as this one, provides that an exhibit or attachment must be filed "electronically along with the main document under one entry number," unless the court orders otherwise.  RCFC, App. E, ¶ 8(c)(i).  The court GRANTS leave for the documents submitted by the parties to be filed as submitted, notwithstanding the fact that individual documents and their exhibits may span multiple docket entry numbers.

Defendant responds that some public disclosures related to Robonaut 2 do not preclude the existence of any Proprietary Information related to Robonaut 2 and maintains that the disputed CAD drawings of Robonaut 2 produced for this litigation are properly designated as Proprietary Information.  Resp. to Pl.'s Mot. Challenging Designation of Docs. Under Protective Order (defendant's Response or Def.'s Resp.), Dkt. Nos. 53-55, at 6-15.  Defendant further objects to plaintiff's request for access to protected information related to Robonaut 2 on multiple grounds.  First, defendant contends that the access sought is prohibited by both the Protective Order and NASA's obligations pursuant to a joint development agreement with General Motors Corporation (General Motors) regarding Robonaut 2 (the joint development agreement[3]).  Def.'s Resp. 2, 4-6.  Defendant also objects to access to Proprietary Information for Mr. Rosheim, specifically, because Mr. Rosheim is a competitive decision-maker for Ross-Hime.  Id. at 2, 15-23.  Finally, defendant raises the issue that the protected information sought is subject to export controls and suggests that, instead of obtaining access to Restricted Information for Mr. Joachim, a United States citizen residing in Canada, plaintiff identify another draftsman located in the United States to avoid necessitating procurement of an export license.  Id. at 2-4, 24-25.

Before the court are:  plaintiff's Motion, filed December 4, 2012; defendant's Response, filed December 12, 2012; plaintiff's Reply, filed January 2, 2013; and Sur-Reply in Opposition to Plaintiff's Motion Challenging Designation of Documents Under Protective Order (defendant's Sur-Reply or Def.'s Sur-Reply), Dkt. No. 67, filed February 1, 2013 by leave of the court.

For the following reasons, plaintiff's Motion is GRANTED-IN-PART AND DENIED-IN-PART.

---

[3] The joint development agreement was executed on December 19, 2006.  See Resp. to Pl.'s Mot. Challenging Designation of Docs. Under Protective Order (defendant's Response or Def.'s Resp.), Dkt. Nos. 53-55, at Ex. B (original joint development agreement) 16, and was in effect for a term of up to five years, see id. at 14.  On October 15, 2010, an amendment to the joint development agreement was executed, which replaced the original agreement and which remains in effect until December 31, 2013.  See id. at Ex. B (joint development agreement, as amended) 41, 46.  The relevant terms of each agreement are substantially similar, if not identical. Unless otherwise stated, the court cites to the amended joint development agreement, which is the agreement currently in effect, when discussing the joint development agreement.  Both are included in Exhibit B to defendant's Response, along with an additional amendment to each agreement, respectively.  Neither of the additional amendments is relevant to the matters addressed in this Opinion and Order.  The court cites to Exhibit B using the page numbers assigned by the court's Case Management/Electronic Case Files system, which appear in the top right corner of the document pages.

II.     Legal Standards

        A.      Protective Orders

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including such an order to "limit[] the scope of disclosure," to designate who may be present for discovery, and to "requir[e] that a trade secret[4] or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Rules of the United States Court of Federal Claims (RCFC) 26(c)(1);[5] see also Forest Prods. Nw., Inc. v. United States, 453 F.3d 1355, 1361 (Fed. Cir. 2006) ("Good cause requires a showing that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden.").

---

[4] The United States (defendant or the government) and Ross-Hime Designs, Inc. (plaintiff or Ross-Hime) disagree over the applicable trade secret law in this case.  See Def.'s Resp. 7 n.6 (arguing that plaintiff's assertion that "'presumably' Texas trade secret law would [apply]" because the allegedly infringing technology "was developed at [the National Aeronautics and Space Administration's (NASA) Johnson Space Center] in Houston," Texas may not be correct because federal statute, Delaware trade secret law or Michigan trade secret law may apply instead (quoting Pl.'s Mot. for Relief from Protected Info. Designation as to Def.'s Robonaut 2 Accused Structure Drawings & Photographs (plaintiff's Motion or Pl.'s Mot.), Dkt. Nos. 45-46, at 4)).  Further, defendant argues that "[t]rade secret law is not necessarily dispositive" of any determination of what constitutes proprietary information under the protective order in this case (Proprietary Information) "because the protective order defines Proprietary Information to be broader than trade secrets in that it also lists technical know-how and any other information that at the time the information is requested is maintained in confidence or in which the party has a proprietary interest."  Id. at 7 (citing Order of Oct. 24, 2011 (Protective Order), Dkt. No. 14, ¶ 8). The court agrees with defendant.  Because the scope of Proprietary Information is broader than trade secrets alone, the court finds that it need not determine which jurisdiction's trade secret law applies to determine whether defendant's designation of Robonaut 2 information as Proprietary Information was proper under the Protective Order, particularly given that defendant does not allege that the Robonaut 2 information designated as Proprietary Information contains trade secrets.  See infra Part III.A.1.a (discussing trade secrets as related to the Proprietary Information designation).

[5] The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP).  See C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) (stating that "[t]he [RCFC] . . . generally follow the [FRCP]"); RCFC 2002 rules committee note ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure.").  Rule 26(c) of the RCFC is substantially identical to Rule 26(c) of the FRCP.  Compare RCFC 26(c), with FRCP 26(c). Therefore, the court relies on cases interpreting FRCP 26(c) as well as those interpreting RCFC 26(c).

The Protective Order filed in this case limits who may have access to information designated as Proprietary Information or Restricted Information or both.  See supra Part I. Pursuant to the Protective Order, if the parties are unable to resolve a dispute with regard to a protected information designation, "the objecting party may seek appropriate relief from the Court, and the designating party shall have the burden of proving that its Protected Information designation is proper."  Protective Order ¶ 31.  Further, until the protected information designation "has been removed by order of the Court or by written consent of the designating party or Supplying Owner," the information "shall nonetheless be treated as Protected Information in accordance with" the Protective Order.  Id. ¶ 32.

The Protective Order may be amended by express order of the court.  Id. ¶ 50. "[I]n determining whether a protective order should be modified, the court must balance the privacy interests of the parties against the public interest in access to discovery information."  Baystate Techs., Inc. v. Bowers (Baystate), 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam) (unpublished decision) (applying Rule 26(c) of the Federal Rules of Civil Procedure (FRCP) and First Circuit law); accord Albino v. United States, 93 Fed. Cl. 405, 410 (2010).

B.      Access to Proprietary Information

Generally, a protective order may be issued for good cause to protect the supplying owner of proprietary information from any competitive harm owing to the use of such proprietary information outside of the litigation in which it was disclosed.  See Standard Space Platforms Corp. v. United States (Standard Space), 35 Fed. Cl. 505, 508-10 (1996) (finding that the defendant failed to show good cause to exclude the plaintiff's president from protected information because such information was unlikely to be misused in light of the facts that the plaintiff company was defunct and the plaintiff's president had left the industry).  Information that is "public knowledge" is not subject to such protection.  Protective Order ¶ 23.

In particular, competitive harm may result when the person accessing the proprietary information is involved in competitive decision-making.  See, e.g., U.S. Steel Corp. v. United States (U.S. Steel), 730 F.2d 1465, 1468 (Fed. Cir. 1984) (stating that, in a case in which in-house counsel were involved in competitive decision-making, the court may need to deny them access to proprietary information, depending on the circumstances); accord In re Deutsche Bank Trust Co. Americas (Deutsche Bank), 605 F.3d 1373, 1377-78 (Fed. Cir. 2010) (extending to patent attorneys).  The United States Court of Appeals for the Federal Circuit (Federal Circuit) has defined "competitive decisionmaking" as "advice and participation in any or all of [a business's] decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."  U.S. Steel, 730 F.2d at 1468 n.3; accord Deutsche Bank, 605 F.3d at 1378; see also Matsushita Electric Indus. Co. v. United States, 929 F.2d 1577, 1580 (Fed.

Cir. 1991) (stating that "the standard is not regular contact with other corporate officials who make policy, or even competitive decisions, but advice and participation in competitive decisionmaking" (internal quotation marks omitted)).

Further, in the context of patent cases, the Federal Circuit has stated that "information related to new inventions and technology under development, especially those that are not already the subject of pending patent applications," is particularly sensitive proprietary information. Deutsche Bank, 605 F.3d at 1381. Nevertheless, information contained in an issued patent "is ordinarily regarded as public." On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GMBH, 386 F.3d 1133, 1141 (Fed. Cir. 2004) (citing Restatement (Third) of Unfair Competition § 39 cmt. f (1995) ("[I]nformation that is disclosed in a patent or contained in published materials reasonably accessible to competitors does not qualify for protection [as a trade secret].")); cf. Protective Order ¶ 23 (stating that information that is public knowledge is not subject to "[t]he restrictions and obligations relating to Proprietary Information"). However, "information and improvements made after a patent application has been filed" "may be separately patentable." Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1244 (Fed. Cir. 1989) (applying 9th Circuit law), abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006). Such information and improvements, therefore, "may be preserved in confidence" as proprietary information, subject to a confidentiality agreement or protective order. See id.

C.     Export Controls and Access to Restricted Information

Items with both commercial and military applications, that is, "dual-use" items, and certain items with civil uses only are subject to export controls pursuant to the Export Administration Regulations (EAR), 15 C.F.R. §§ 730.1-774.1 & supps. (2012), promulgated pursuant to the Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503 (codified as amended at 50 U.S.C. app. §§ 2401-20 (2006)).[6]  See 15 C.F.R. §

---

[6] Although the Export Administration Act of 1979 (EAA), Pub. L. No. 96-72, 93 Stat. 503 (codified as amended at 50 U.S.C. app. §§ 2401-20 (2006)), was scheduled to expire in 2001, see 50 U.S.C. app. § 2419 (providing a termination date of August 20, 2001), and has not been renewed by Congress, the EAA has nonetheless been extended since 2001 by executive order, see Continuation of the National Emergency with Respect to Export Control Regulations, 77 Fed. Reg. 49,699 (Aug. 15, 2012) ("Because the [EAA] has not been renewed by the Congress, the national emergency declared on August 17, 2001, must continue in effect beyond August 17, 2012.  Therefore, in accordance with . . . the National Emergencies Act (50 U.S.C. [§] 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13222"); Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001) (stating that the EAA "shall be carried out under this order so as to continue in full force and effect" and that "[a]ll rules and regulations issued or continued in effect by the Secretary of Commerce under the authority of the [EAA] . . . shall . . . remain in full force and effect").

730.3 (discussing "dual-use" items and the scope of the EAR); id. § 732.2 (describing steps for determining whether a particular item is subject to EAR); id. pt. 732 supp. 2 (illustrating the steps in a flow chart).  Obligations under the EAR are determined by first classifying an item for export by locating the item on the Commerce Control List to determine the item's Export Control Classification Number (ECCN) and then checking for licensing requirements for the item's ECCN relative to the country of destination.  Id. § 732.1(b)(1)-(2); see id. pts. 738 supp. 1 (Commerce Country Chart), 774 supp. 1 (Commerce Control List).  Certain general prohibitions may also necessitate a license under the EAR.  Id. § 732.1(c); see id. § 736.2(b) (describing the ten general prohibitions).  For some ECCNs, a license exception may be available to overcome a licensing requirement.  Id. § 732.1(e); see id. § 740.1(a) (describing potential license exceptions, generally).  To the extent that information is subject to the EAR and requires an export license, it is Restricted Information pursuant to the Protective Order.  See Protective Order ¶ 7 (stating that Restricted Information includes "information that may not be exported lawfully without approval, authorization, or license").

Articles and services that have been designated by the president of the United States as "defense articles and defense services" by inclusion on the United States Munitions List (U.S. Munitions List) are subject to a different set of export controls pursuant to the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120.1-130.17 (2012), promulgated pursuant to the Arms Export Control Act of 1976, Pub. L. No. 94-329, 90 Stat. 734 (codified as amended, in relevant part, at 22 U.S.C. § 2778 (2006)).  22 C.F.R. § 120.2; see id. § 121.1 (U.S. Munitions List).  Generally, an article may be designated as a defense article only if it "[i]s specifically designed, developed, configured, adapted, or modified for a military application, and" either "[d]oes not have predominant civil applications, and . . . [d]oes not have [a] performance equivalent . . . to those of an article or service used for civil applications; or . . . has significant military or intelligence applicability," necessitating control under ITAR.  Id. § 120.3.  Unless an exemption applies, items designated as defense articles require approval for export by the Directorate of Defense Trade Controls, which is generally in the form of a license.  See id. § 123.1.  Therefore, defense articles requiring a license or other approval for export are Restricted Information pursuant to the Protective Order.  See Protective Order ¶ 7 (stating that Restricted Information includes "information that may not be exported lawfully without approval, authorization, or license").

Defense articles on the U.S. Munitions List are regulated under ITAR by the Department of State, as distinguished from items on the Commerce Control List, which are regulated under the EAR by the Department of Commerce.  See 22 C.F.R. § 120.5.  Defense articles subject to ITAR are not subject to EAR.  See 15 C.F.R. § 734.3(b)(1)(i) (stating that defense articles subject to ITAR are "exclusively controlled for export"  by the Department of State).

D.     Space Act and the Joint Development Agreement

Pursuant to the National Aeronautics and Space Act (Space Act), Pub. L. No. 111-314, 124 Stat. 3328 (2010) (to be codified in relevant part at 51 U.S.C. §§ 20101-64), NASA is authorized to enter into such agreements and transactions "as may be necessary in the conduct of its work and on such terms as it may deem appropriate."  51 U.S.C.A.[7] § 20113(e) (West 2012).  The joint development agreement between NASA and General Motors is such an agreement, referred to as a Space Act agreement.  See Def.'s Sur-Reply 4.

Trade secrets or confidential information resulting from Space Act agreements may be protected "for a period of up to 5 years after the development of" such information.  51 U.S.C.A § 20131(b).

E.     Interpretation of Contract Terms

Contracts to which the government is a party are subject to the general rules of contract interpretation.  Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).  Pursuant to these rules, "[c]ontract interpretation begins with the language of the written agreement."  Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  Contract provisions that are "clear and unambiguous . . . must be given their plain and ordinary meaning."  McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (internal quotation marks omitted); accord Barsebäck Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997).

III.   Discussion

Plaintiff's Motion states that plaintiff[8] seeks "relief from Protected Information Designation[s]" as to defendant's "Robonaut 2 accused structure descriptions, drawing[s]

_____

[7] The National Aeronautics and Space Act (Space Act), Pub. L. No. 111-314, 124 Stat. 3328 (2010) (to be codified in relevant part at 51 U.S.C. §§ 20101-64), was enacted "to codify certain existing laws related to national and commercial space programs as a positive law title of the United States Code" at title 51.  Space Act § 2(a), 124 Stat. at 3328.  The United States Code is published every six years by the Government Printing Office.  Because the 2012 edition is not yet available and the 2006 edition does not include the Space Act, the court cites to the Space Act as it appears in the United States Code Annotated (U.S.C.A.), which is current through December of 2012.

[8] Defendant notes that plaintiff's request for access is confusing because "both plaintiff's motion and reply at first state that 'it,' i.e.[,] the corporate plaintiff Ross-Hime Designs, Inc., seeks access to the disputed [Robonaut 2] proprietary information."  Sur-Reply in Opp'n to Pl.'s

and photographs." Pl.'s Mot. 1.  The court construes plaintiff's request as a challenge to the government's Proprietary Information designations pursuant to paragraph 31 of the Protective Order.  See Protective Order ¶ 31 (describing procedure for challenging protected information designations); see also infra Part III.B (explaining that plaintiff does not appear to challenge defendant's Restricted Information designations).  Plaintiff's Motion also states that plaintiff seeks "full access" to defendant's "Robonaut 2 drawings and photographs" for Mr. Rosheim and Mr. Joachim.  Pl.'s Mot. 1.  Therefore, to the extent that defendant's protected information designations are proper, the court also considers whether amendment of the Protective Order is warranted to permit such access.  See Protective Order ¶ 50 (providing for amendment of the Protective Order by the court).

Plaintiff's Reply states that there are nine categories of descriptions, drawings and photographs related to Robonaut 2 as to which plaintiff seeks access for Mr. Rosheim and Mr. Joachim.  Pl.'s Reply 1-2.  Plaintiff appears to represent that the government does not dispute greater access to categories (1)-(5), which include four categories of publicly disclosed information and, in category (5), documents designated as Restricted Information.  See id.  The government does not state in its briefing that it opposes access by either Mr. Rosheim or Mr. Joachim to these categories, except to the extent that it opposes access by Mr. Joachim to category (5), Restricted Information.  See Def.'s Resp. 24-25; Def.'s Sur-Reply 18.  Access to category (7), documents that lack a restrictive legend, Pl.'s Reply 2, also does not appear to be disputed.[9]  The court, therefore,

---

Mot. Challenging Designation of Docs. Under Protective Order (defendant's Sur-Reply or Def.'s Sur-Reply), Dkt. No. 67, at 1.  Defendant further notes that plaintiff, "th[r]ough its attorneys and independent expert, already has access to all documents produced, including" protected information.  Id.  The court construes plaintiff's request as a request for access to Proprietary Information for plaintiff's principal, Mark E. Rosheim (Mr. Rosheim), and a request to allow plaintiff's draftsman, Michael Joachim (Mr. Joachim), to be a "Proprietary Person" under the Protective Order, that is, a person who "may have access to both Proprietary and Restricted Information."  Cf. Pl.'s Mot. 4 (arguing that "[t]he United States cannot continue to restrict [Mr. Rosheim and Mr. Joachim] from accessing NASA[-]produced discovery relating to Robonaut 2); Protective Order ¶¶ 10 (granting Mr. Rosheim access to Restricted Information only), 11 (describing a "Proprietary Person").

[9] Pursuant to the Protective Order, any document containing protected information is to be labeled with a restrictive legend, marking the document as containing "PROPRIETARY INFORMATION or RESTRICTED INFORMATION."  Protective Order ¶ 17.  In order to be treated as Restricted Information, documents must be "so designated or identified with restrictive markings."  Id. ¶ 7.  Similarly, except with respect to certain limited circumstances surrounding inspections by people with access to Proprietary Information, see id. ¶¶ 19-20, "[t]he restrictions and obligations relating to Proprietary Information shall not apply to any information that is not so marked," id. ¶ 23.  Therefore, under the terms of the Protective Order, drawings and

addresses only the disputed categories, that is categories (6) and (8)-(9), which include drawings and photographs created for this litigation and drawings and photographs older than five years or that lack a date, as well as category (5), Restricted Information, as to Mr. Joachim.  Cf. id. (describing categories (5)-(6) and (8)-(9)); Protective Order ¶ 31 (stating that the parties may seek relief from the court only if they cannot resolve a dispute over a protected information designation on their own).  In addition to these numbered categories, plaintiff states in its Reply that the access sought includes "photographs and CAD drawings of the [Robonaut 2] hand and forearm that have been produced in discovery."  Pl.'s Reply 2 (citing Pl.'s Reply Exs. 18-20 (Robonaut 2 CAD drawings and a CAD blueprint)).  The court addresses these documents, as well.

> A.      Access to Proprietary Information:  Mr. Rosheim

> 1.      Challenge to Proprietary Information Designation

Defendant has the burden of showing that the disputed Robonaut 2 information was properly designated as Proprietary Information and that such protection was not waived by public disclosure.  See Protective Order ¶¶ 23 (excluding public knowledge from protection), 31 (providing that "the designating party shall have the burden of proving that its Protected Information designation is proper").  Defendant argues that "non-public documents that involve [Robonaut 2] technology" are properly designated as Proprietary Information because the joint development agreement between NASA and General Motors obligates NASA "to protect [Robonaut 2] technology from disclosure." Def.'s Resp. 6; see also id. at 5 ("As part of the [joint development] agreement, NASA is to maintain in confidence 'data' that it produces in carrying out the joint development of [Robonaut 2].").  In response to plaintiff's argument that Mr. Rosheim should have access to Robonaut 2 information that "corresponds with the access Defendant has authorized Mr. Rosheim to . . . NASA Robonaut 1" information, Pl.'s Mot. 1, defendant states that Mr. Rosheim's access to Robonaut 1 and Robonaut 2 are different because Robonaut 1 was developed using public funds, but Robonaut 2 was developed in collaboration with General Motors and is subject to the obligations of the joint development agreement, Def.'s Sur-Reply 17.  Plaintiff maintains that the joint development agreement creates "no restriction" because it "specifically excepts out documents produced pursuant to a court order."  Pl.'s Reply 6 (capitalization and emphasis omitted) (citing Def.'s Resp. Ex. B (joint development agreement)).

Plaintiff also argues that Mr. Rosheim should have access to "NASA[-]produced discovery relating to Robonaut 2, because NASA has public[ly] disclosed and

---

photographs that lack a restrictive legend are neither Restricted Information nor Proprietary Information, and neither Mr. Rosheim nor Mr. Joachim is denied access to such documents.

repeated[ly] published the accused structure in technical publications, public displays and models, on its website and in over 40 patents and patent applications." Pl.'s Mot. 4; see also id. at 2-3 (listing specific disclosures related to Robonaut 2);[10] Pl.'s Reply 4-6 (same). Defendant responds that NASA has not "waived its right to identify any [Robonaut 2] technology as Proprietary Information . . . simply by virtue of public disclosure of some information about" Robonaut 2. Def.'s Resp. 9. Indeed, defendant contends that publicly disclosed information about Robonaut 2 does not go beyond the information made public in patent applications. Id. at 14; see id. at 9-10 (arguing that the "[Robonaut 2] technology that is Proprietary Information . . . has not been disclosed to the public"). In support of its position, defendant asserts that publicly disclosed information about Robonaut 2 differs from the Proprietary Information with respect to Robonaut 2, as to which plaintiff seeks greater access, because such Proprietary Information "includes dimensions, tolerances, material specifications, commercial part selections, surface finishe[s], and kinematic information," which it describes as "know-how that has been developed and refined over several years." Id. at 14.

The court considers whether defendant has met its burden of demonstrating that its Proprietary Information designation was proper with respect to each of (1) drawings and photographs created for this litigation, (2) photographs and CAD drawings of the Robonaut 2 hand and forearm produced in discovery, and (3) drawings and photographs that are more than five years old or lack a date.

a.     Drawings and Photographs Created for This Litigation

The parties have identified the Proprietary Information designation as disputed with respect to the following drawings created for this litigation: the documents contained in Exhibits 15 and 16 to plaintiff's Reply,[11] see Pl.'s Reply 3-4; Def.'s Sur-

---

[10] Although plaintiff's Motion also discusses disclosures related to Robonaut 1, see Pl.'s Mot. 2, plaintiff's Motion does not appear to seek redesignation of information related to Robonaut 1, see Pl.'s Reply in Supp. of Mot. for Relief from Protected Info. Designation as to Def.'s Robonaut 2 Accused Structure Drawings & Photographs (plaintiff's Reply or Pl.'s Reply), Dkt. No. 62, at 1 (clarifying that plaintiff's Motion "sought de-designation of only a subset of Proprietary designated document production from the United States, namely Robonaut 2 accused structure descriptions, drawings and photographs"). Accordingly, the court does not address whether any protected information designations with respect to information related to Robonaut 1 were proper.

[11] Plaintiff lists Exhibits 15-21 as examples of "documents that NASA prepared for this litigation." Pl.'s Reply 6. Exhibit 17, a CAD drawing of Robonaut 1, is not disputed and so is not discussed further by the court. See supra note 10. Whether Exhibits 18, 19 and 20 were created for this litigation is unclear. Defendant excludes them from its list of "examples of [Robonaut 2] CAD drawings created specifically for this litigation." See Def.'s Sur-Reply 8 n.6.

11

Reply 8 n.6, and six series of CAD drawings created in response to plaintiff's production requests related to Robonaut 2, see Mot. for Approval of Proposed Schedule of CAD Produc. (CAD Produc. Mot.), Dkt. No. 44, at 1-2 (stating that plaintiff made six requests for production related to Robonaut 2 and describing why each request required a series of drawings); Def.'s Sur-Reply Exs. K-1 to K-5 (series responsive to plaintiff's third production request related to Robonaut 2); see also Pl.'s Mot. 3 (describing NASA's designation of Proprietary Information with respect to the series responding to plaintiff's third request as the "culmination of reasons for Plaintiff's instant Motion").

    In determining whether the drawings created for this litigation were properly designated as Proprietary Information because the joint development agreement requires them to be maintained in confidence, the court turns first to the plain language of the agreement. Cf. Coast Fed. Bank, FSB, 323 F.3d at 1038 ("Contract interpretation begins with the language of the written agreement."). The joint development agreement provides that, in the event that General Motors requests that "Data first produced by NASA[12] . . . be maintained in confidence, and to the extent NASA determines that such Data would be Proprietary Data if it had been obtained from [General Motors], NASA will mark such Data with a restrictive notice and will maintain such marked Data in confidence for five (5) years after development of the Data." Def.'s Resp. Ex. B (joint development agreement) 36 (footnote added). "Data" is defined as "recorded information" and includes "data of a scientific or technical nature." Id. at 34. "Proprietary Data" is "Data embodying trade secrets or comprising commercial or financial information that is privileged or confidential." Id. at 35. Therefore, for

---

The court addresses Exhibits 18, 19 and 20 in Part III.A.1.b-c. Exhibit 21 contains a drawing that was part of the series of drawings produced in response to plaintiff's third production request with respect to Robonaut 2, and so is addressed in the discussion of the six series of CAD drawings. See Def.'s Request to File a Sur-Reply to Pl.'s Mot. Challenging Designation of Docs. Under the Protective Order, Dkt. No. 63, at 1-2; cf. Def.'s Sur-Reply Exs. K-1 to K-5 (entire series).

    [12] To the extent that defendant suggests that the provision of the joint development agreement applicable to data first produced by General Motors governs confidentiality obligations instead of the provision applicable to data first produced by NASA, see Def.'s Sur-Reply 4-5, defendant's suggestion is inapt. The alternative provision obligates NASA to keep confidential certain Data that "is furnished to NASA" after it is "first produced by [General Motors] in carrying out [its] responsibilities under [the joint development agreement agreement]." Def.'s Resp. Ex. B. (joint development agreement) 36. Here, despite the joint development of the underlying Robonaut 2 technology, cf. Def.'s Sur-Reply 4-5, NASA has created the drawings at issue; they have not been furnished by General Motors, see Def.'s Resp. 26 (describing creation of CAD drawings by NASA for this litigation). Accordingly, the provision governing "Data" first produced by NASA is applicable. Cf. Def.'s Resp. Ex. B (joint development agreement) 34 (defining "Data" as "recorded information, regardless of form, the media on which it may be recorded, or the method of recording").

drawings and photographs to be protected on the basis that they must be maintained in confidence pursuant to the joint development agreement, defendant must show that: (1) General Motors has requested that they be maintained in confidence and (2) if General Motors had produced the drawings and photographs, they would "embody[] trade secrets or commercial or financial information that is privileged or confidential." See id. at 34-36.

With respect to the first requirement, defendant does not mention in its briefing that General Motors requested that any of the disputed drawings created for this litigation, specifically, be maintained in confidence but repeatedly states that "NASA and [General Motors] confer before disclosing any technical information about [Robonaut 2] to make sure that any disclosure conforms to the agreement." See Def.'s Resp. 5, 12, 14. With respect to the second requirement, defendant does not make the argument that the disputed drawings contain trade secrets, only that such an argument is not foreclosed. See Def.'s Resp. 8-9 (discussing why Texas trade secret law does not support plaintiff's Motion with respect to public disclosures); Def.'s Sur-Reply 12-14 (arguing that some public disclosures of Robonaut 2 technology do not waive trade secret protection for all Robonaut 2 technology). Instead, defendant argues--without further explanation--that the drawings can be protected as commercial information because General Motors "expended a great deal of money to create the disputed [Robonaut 2] proprietary information," Def.'s Sur-Reply 12, and that some of the drawings disclose Robonaut 2 "technical and financial information," id. at 1. The court is not persuaded that defendant has sufficiently shown that, under the terms of the joint development agreement, defendant was required to maintain the disputed drawings created for this litigation in confidence. Cf. Def.'s Resp. Ex. B (joint development agreement) 34-36.

Nevertheless, the court finds that defendant's Proprietary Information designation with respect to the disputed drawings created for this litigation is supported because General Motors maintains a proprietary interest in the drawings. Cf. Protective Order ¶ 8 (stating that Proprietary Information includes information "in which the party or Supplying Owner maintains a proprietary interest"). "Proprietary interest" is not defined in the Protective Order. Black's Law Dictionary contains an entry for "proprietary interest," which refers the reader to the second definition of "interest": "[a] legal share in something; all or part of a legal or equitable claim to or right in property <right, title, and interest>." Black's Law Dictionary 885, 1339 (9th ed. 2009). Pursuant to the joint development agreement, "title to patentable inventions made . . . as a result of activities performed under [the agreement] will remain with the respective inventing party(ies)." Def.'s Resp. Ex. B (joint development agreement) 39. The court therefore finds that General Motors has a proprietary interest in non-public Robonaut 2 technology because such technology could lead to patentable inventions owned in whole or in part by General Motors, constituting a legal share or property right. Cf. Richardson, 868 F.2d at 1244 (stating that "information and improvements made after a patent application has been

filed" "may be separately patentable" and "may be preserved in confidence"); Black's Law Dictionary 885 (defining "interest").

Further, to the extent that any of the drawings created for this litigation contain technical details, characterized by defendant as "know-how," see Def.'s Resp. 14, such details are properly designated as Proprietary Information, cf. Protective Order ¶ 8 (including "technical know-how" in its definition of Proprietary Information). Based on the court's comparison of the CAD drawings and corresponding JPEGs created for this litigation, see Pl.'s Reply Exs. 15, 16 (examples of Robonaut 2 CAD drawings created for this litigation); Def.'s Sur-Reply Exs. K-1 to K-5 (same), with other publicly available CAD drawings cited by plaintiff, see, e.g., Pl.'s Reply 4-6; see also Pl.'s Mot. Exs. 6 (patent for grasp assist device, technology related to Robonaut 2), 8 (patent application for robotic finger assembly, technology related to Robonaut 2); Pl.'s Reply Ex. 22 (Robonaut 2 Overview), the court is persuaded by defendant's argument that "[t]here are millions of dollars of value that exist in the [Robonaut 2] CAD models and drawings that one of ordinary skill in the art could and would need to reproduce to go from the published [Robonaut 2] patent applications, patents, or papers to a working [Robonaut 2]," Def.'s Resp. 17 (citing Def.'s Resp. Ex. A (Declaration of Myron A. Diftler, Ph.D.) ¶ 22)); see also CAD Produc. Mot. 2 (stating that the CAD drawings created for this litigation "had to be created using the existing [Robonaut 2] CAD model" because "these CAD views did not already exist"). The court agrees with defendant that disclosure of these models and detailed drawings may jeopardize General Motors's investment and any competitive advantage to be gained from General Motors's interest in the joint development of Robonaut 2. Cf. Def.'s Resp. 18 ("To release the models and detailed drawings would be to give away [General Motors's] investment and competitive advantage.").

With respect to whether the information contained in the disputed drawings created for this litigation has been previously disclosed, defendant asserts that the drawings "show details and view angles not discernible from the [Robonaut 2] technical information that is public[ly] available" and that the corresponding JPEG files have a higher resolution than any that are publicly available. Def.'s Sur-Reply 13-14. Based on the court's comparison, the court agrees with defendant that the Robonaut 2 CAD drawings and corresponding JPEG files created for this litigation contain greater or different technical details than other publicly disclosed Robonaut 2 information and, therefore, are not public knowledge. Compare, e.g., Pl.'s Reply 4-6 (reprinting publicly disclosed CAD drawings), with Pl.'s Reply Exs. 15-16 (reprinting CAD drawings created for this litigation that were designated as Proprietary Information), and Def.'s Sur-Reply Exs. K-1 to K-5 (same). The court is also persuaded by defendant's argument that "plaintiff's continuing call for defendant to produce more . . . CAD drawings" belies plaintiff's position that the information contained in the disputed drawings created for this litigation is already publicly available. Cf. Def.'s Resp. 25. Indeed, if all of the

14

information to which greater access is sought were public, plaintiff would not need to request access to Proprietary Information for Mr. Rosheim, nor would plaintiff need CAD drawings created in the first place. Accordingly, the court finds that the drawings created for this litigation and discussed above were not precluded from protection as Proprietary Information pursuant to paragraph 23 of the Protective Order. Cf. Protective Order ¶ 23 (excluding public knowledge from protection).

With respect to photographs taken for this litigation at ICRA 2012, see supra Part I--during partial disassembly of the space hand for a private inspection by plaintiff's counsel and technical expert, Theodore F. Neils (Mr. Neils), which Mr. Rosheim was not permitted to attend[13]--there appears to have been some confusion about whether a protected information designation was made. Although defendant argued that the photographs were properly designated as Proprietary Information because they "are not photographs that the public would have been able to take during a public viewing," Def.'s Resp. 10-12; see also id. at 10 n.8 (describing conditions of the inspection), defendant later conceded in its Sur-Reply that photographs and videos taken during the space hand inspection at ICRA 2012 "were not identified as protected information under the protective order, so Mr. Rosheim is able to view these photographs and videos," Def.'s Sur-Reply 16-17; see also supra note 9 (stating that information lacking a restrictive legend is not treated as protected). Because the parties do not identify any other Robonaut 2 photographs created for this litigation to which plaintiff seeks greater access, and, because the issue no longer appears to be disputed with respect to the photographs and videos taken at ICRA 2012, the court does not address further the designation of photographs created for this litigation.

    b.    Photographs and CAD Drawings of the Robonaut 2 Hand and Forearm Produced in Discovery

Plaintiff has identified three additional documents produced in discovery as to which it challenges defendant's Proprietary Information designation. Pl.'s Reply 2; see also supra note 11 (identifying Exhibits 18-20 to plaintiff's Reply as documents that were produced in discovery but not claimed to be created for this litigation). These documents were submitted to the court as Exhibits 18, 19 and 20 to plaintiff's Reply. See Pl.'s Reply Exs. 18-20. Exhibit 18 is an undated CAD drawing of the Robonaut 2 hand. See Tbl. of Reply Exs., Dkt. No. 62-1; Pl.'s Reply Ex. 18. Exhibit 19 is a CAD blueprint of the Robonaut 2 thumb base mount, dated November 29, 2007. See Tbl. of Reply Exs.;

---

[13] Defendant states that, contrary to plaintiff's assertion, Mr. Rosheim could have visited NASA's booth at the conference as a member of the public; however, Mr. Rosheim was not permitted to attend plaintiff's private inspection during the partial disassembly of Robonaut 2 "because its entire purpose was the disclosure of Proprietary Information." Def.'s Resp. 11; cf. Pl.'s Mot. 2-3.

Pl.'s Reply Ex. 19.  Exhibit 20, which is undated and labeled "R2 Hand_Forearm," is a series of sixteen slides detailing the Robonaut 2 hand and forearm through CAD drawings, diagrams and descriptions.  See Tbl. of Reply Exs.; Pl.'s Reply Ex. 20.  The court limits its discussion of documents produced in discovery to those specifically identified by plaintiff and submitted to the court because the court must be able to make a document-specific determination about whether such documents were properly designated as Proprietary Information.

Defendant argues that Exhibits 18-20 disclose "technical and financial information."  Def.'s Sur-Reply 1 (including Exhibits 18-20 in a list of documents that allegedly disclose such information).  Plaintiff argues that Exhibits 18-20 "do not include the technical details sought to be protected by the United States, such as dimensions, tolerances, material specifications and the like."  Pl.'s Reply 4.  Defendant responds that plaintiff's assertion is "clearly wrong," pointing to Exhibit 19 as an example of a document that "actually does contain a number of dimensions throughout, along with information descriptive of 'fabrication tolerances.'"  Def.'s Sur-Reply 13.

The court cannot discern any financial information in the content of these documents, nor does defendant provide any support for this assertion.  Nevertheless, the court finds, based on its inspection of the documents, that all three contain different or greater technical details than other publicly disclosed drawings cited by plaintiff--details that may constitute technical know-how or information in which General Motors maintains a proprietary interest.  Cf. Protective Order ¶¶ 8 (defining Proprietary Information), 23 (excluding public knowledge from Proprietary Information).  Compare Pl.'s Reply Exs. 18-20, with Pl.'s Mot. Exs. 6 (patent for grasp assist device, technology related to Robonaut 2), 8 (patent application for robotic finger assembly, technology related to Robonaut 2), and Pl.'s Reply Ex. 22 (Robonaut 2 Overview).  Specifically, Exhibits 18 and 20 appear, based on the court's inspection, to "show details and view angles not discernible from [Robonaut 2] technical information that is public[ly] available" and to do so at a higher resolution than publicly available information, cf. Def.'s Sur-Reply 13-14.  Compare, e.g., Pl.'s Reply 4-6 (reprinting publicly disclosed CAD drawing), with Pl.'s Reply Exs. 18, 20 (reprinting CAD drawings produced in discovery that were designated as Proprietary Information).  Exhibit 19 does, as defendant claims, include information about dimensions, materials, and tolerances.  See Pl.'s Reply Ex. 19.  The court is persuaded that the information contained in the Robonaut 2 CAD drawings represents millions of dollars in value and would be necessary, in addition to the publicly available information, to create a working Robonaut 2, see supra Part III.A.1.a, and that Exhibits 18-20, in particular, contain technical know-how, cf. Protective Order ¶ 8 (including "technical know-how" in its definition of Proprietary Information).  Further, the court has recognized that General Motors has a proprietary interest in the joint development of Robonaut 2 technology that may be jeopardized by disclosure of such drawings, see supra Part III.A.1.a; cf. Protective Order

¶ 8 (stating that Proprietary Information includes information "in which the party or Supplying Owner maintains a proprietary interest").

        c.       Drawings and Photographs Older than Five Years or That Lack a Date

In its Reply, plaintiff states without elaboration that drawings and photographs that are older than five years or that lack a date are included in the subset of accused structure descriptions, drawings and photographs related to Robonaut 2 as to which its Motion challenged the Proprietary Information designation.  See Pl.'s Reply 2.  The court construes the protected information designation challenge in plaintiff's Motion as to "Robonaut 2 accused structure descriptions, drawing[s] and photographs" broadly enough to encompass drawings and photographs related to Robonaut 2 that are older than five years or that lack a date.  Cf. Pl.'s Mot. 1.  Defendant argues that "[t]he disputed [Robonaut 2] proprietary information should be kept non-public for at least five years from the end of the [joint development] agreement."  Def.'s Sur-Reply 6 (emphasis omitted).

The five-year time frame referenced by the parties derives from a federal statute, in effect until 2010 at 42 U.S.C. § 2454 and to be codified under the Space Act at 51 U.S.C. § 20131, see supra note 7, which provides that information resulting from Space Act agreements that would be trade secrets or "commercial or financial information that is privileged or confidential under the meaning of section 552(b)(4) of title 5" if it had been obtained by a non-federal party may be protected "for a period of up to 5 years after the development of [such] information," 51 U.S.C.A. § 20131(b); cf. Freedom of Information Act, 5 U.S.C. § 552(b)(4) (2006) (exempting "trade secrets and commercial or financial information . . . [that is] privileged or confidential" from disclosure indefinitely).  After the five-year period ends, the information "shall be made available for public inspection," unless federal statute provides otherwise or the information is classified to protect national security.  51 U.S.C.A. § 20131(a).  The statutory provision is echoed in the joint development agreement.  See Def.'s Resp. Ex. B (joint development agreement) 36 (providing for five years of protection for information first produced by NASA under the joint development agreement and as to which General Motors desires to be maintained in confidence).  Plaintiff, therefore, appears to seek access to any photographs and drawings that, pursuant to the Space Act, must now be made available for public inspection because the relevant five-year restricted period has expired.[14]  See Pl.'s Reply 2.

---

[14] Plaintiff also appears to seek access to the original joint development agreement on the same grounds.  See Pl.'s Reply 6 n.4 (arguing that the original joint development agreement should be "de-designated" as Proprietary Information, "given that it is more than 5 years old" (citing 42 U.S.C. § 2454 (2006))).  However, plaintiff's request is untimely because plaintiff's Motion challenged defendant's protected information designations only with respect to "Robonaut 2 accused structure descriptions, drawing[s] and photographs"--not with respect to

Defendant suggests, without explaining its position, that "it would be appropriate for the five-year time period to commence at the expiration of the [joint development] agreement," on December 31, 2013. Def.'s Sur-Reply 7. With respect to documents that lack a date, defendant argues that the five-year period should be "measured from the date of production of each document to plaintiff." Id. at 7-8. Defendant explains that this "would not penalize NASA and [General Motors] for not placing a creation date on each document . . . , a requirement that is not included in the [joint development] agreement," and that it "would also be more practicable for the United States to implement because the date of production of a document to plaintiff is clear, whereas the date a document was created may not be clear." Id. at 8. Defendant's position with respect to the start of the five-year period is contradicted by both the Space Act and the joint development agreement: both are clear that the five-year period begins to run after the development of the protectable information. See 51 U.S.C.A. § 20131(b) (providing for protection "for a period of up to 5 years after the development of information"); Def.'s Resp. Ex. B. (joint development agreement) 36 (providing for protection "for five (5) years after development of the Data").

Indeed, defendant concedes that the Space Act and joint development agreement could also be interpreted to mean that "the time period [would] commence at the creation or completion of the technical information in question." Def.'s Sur-Reply 7. The court finds this interpretation to be consistent with the Space Act and the joint development agreement. Cf. 51 U.S.C.A. § 20131(b); Def.'s Resp. Ex. B. (joint development agreement) 36. Nonetheless, defendant expresses concern that "the timing of such creation or completion may not be readily discernible." Def.'s Sur-Reply 7; see also id.

---

the original joint development agreement. See Pl.'s Mot. 1. In other words, plaintiff's request is untimely because the issue was first raised in a reply brief. Cf. United States v. Ford Motor Co., 463 F.3d 1267, 1276-77 (Fed. Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before this court."); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief--they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). The court, therefore, treats the argument as waived. Cf. Corus Staal BV v. United States, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007) ("[The plaintiff] did not raise that argument in its opening brief, however, and we therefore treat that argument as waived."); Novosteel SA, 284 F.3d at 1274 (stating that when an argument is raised for the first time in a reply brief, "[a]s a matter of litigation fairness and procedure," the argument must be treated as waived). To the extent that Mr. Rosheim may be able to access the agreement as a member of the public under the Space Act or the Freedom of Information Act, 5 U.S.C. § 552 (2006), he can request access from NASA through its administrative process, see 14 C.F.R. § 1206.200(c) (2013) (stating that certain agency records can be obtained for public inspection by request and that NASA's electronic reading room records shall include a guide for requesting records or information from NASA).

at 8 (same concerning documents without dates).  However, this is a question of fact; the court cannot disregard the requirements of the Space Act or the terms of the joint development agreement because difficult factual findings may be necessary.  Defendant also expresses concern that "this interpretation would devalue any improvements made during the course of the agreement."  Id. at 7.  The court is not persuaded by this argument and notes that, to the extent that an improvement constitutes new Data under the agreement and new protectable information under the statute, protection would still be available from the date of creation of such an improvement.  Cf. 51 U.S.C.A. § 20131(b); Def.'s Resp. Ex. B (joint development agreement) 36.

Plaintiff has not identified any specific photographs or drawings that are allegedly older than five years or that lack a date as to which it seeks access for Mr. Rosheim.  Because the age of such documents is a question of fact specific to each document, the court considers only whether disputed documents submitted to the court should be disclosed on this basis.

First, with respect to drawings created for this litigation, see supra Part III.A.1.a, Exhibits 15 and 16 to plaintiff's Reply are not dated, see generally Pl.'s Reply Exs. 15-16.  However, both parties appear to identify the two exhibits as drawings created for this litigation, see Pl.'s Reply 6; Def.'s Sur-Reply 8 n.6; see also Pl.'s Reply 3-4 (citing Order of Dec. 16, 2011, Dkt. No. 26 (ordering defendant to produce CAD drawings of Robonaut 1 and Robonaut 2 "to plaintiff's counsel on a rolling basis as they become available")), that is, after the Complaint was filed on April 1, 2011, see generally Compl.  Therefore, the court finds that Exhibits 15 and 16 to plaintiff's Reply are still within the five-year period and are not subject to disclosure on that basis.  Cf. 51 U.S.C.A. § 20131(b); Def.'s Resp. Ex. B (joint development agreement) 36.  Each of the six series of CAD drawings created in response to plaintiff's production requests related to Robonaut 2 was also created within the last five years.  See CAD Produc. Mot. 1 (describing series of such CAD drawings produced on November 13, 2012 after being created for this litigation and stating that additional CAD drawings responsive to the remaining five production requests related to Robonaut 2 would be created and produced by February 15, 2013).  Therefore, they are also not subject to disclosure at this juncture on the basis of being more than five years old.  Cf. 51 U.S.C.A. § 20131; Def.'s Resp. Ex. B (joint development agreement) 36.

With respect to photographs and drawings produced in discovery, see supra Part III.A.1.b, Exhibits 18 and 20 to plaintiff's Reply are not dated, and defendant did not address when these documents were created in its Sur-Reply.  Exhibit 19 is dated November 29, 2007, making it more than five years old.  See Pl.'s Reply Ex. 19. Therefore, Exhibit 19, to the extent that it was "obtained or developed by the [NASA] Administrator in the performance of the Administrator's functions," is outside the five-year period during which confidential information can be protected from public

19

disclosure pursuant to the Space Act and "shall be made available for public inspection." Cf. 51 U.S.C.A. § 20131.  Defendant SHALL FILE a supplemental brief, as further provided in Part IV, addressing when Exhibits 18 and 20 were created, whether each of Exhibits 18-20 was obtained or developed by the NASA Administrator, and whether being subject to public inspection under the Space Act brings the documents to public knowledge within the meaning of paragraph 23 of the Protective Order.  Plaintiff SHALL FILE a supplemental reply brief to defendant's supplemental brief as further provided in Part IV.

For the reasons stated, except with respect to Exhibits 18-20 to plaintiff's Reply, as to which the court withholds a decision pending further briefing, the court finds defendant's Proprietary Information designations proper, and plaintiff's Motion is DENIED with respect to its challenge to such Proprietary Information designations.

The court next considers whether amendment of the Protective Order is warranted to grant Mr. Rosheim access to properly designated Proprietary Information.  Cf. Protective Order ¶ 50 (providing for amendment of the Protective Order by court order).

2.      Need for Amendment and Mr. Rosheim as a Competitive Decision-Maker

Defendant argues that, balancing the need for discovery against the potential harm to the disclosing party, Mr. Rosheim, as "an inventor and author in the field of robotics[] and a competitive decision maker for plaintiff, . . . should not be allowed" access to Proprietary Information.  Def.'s Resp. 18 (emphasis omitted).  In support of its position, defendant asserts that, "[a]ccording to his website, Mr. Rosheim is the named inventor on 21 patents in the field of robot technology" and that "Mr. Rosheim is the only named inventor on both of the patents that plaintiff alleges are infringed by NASA."  Id. Defendant also states that, "according to public[ly] available [United States Patent and Trademark Office] records, Mr. Rosheim has two active pending patent applications."  Id. at 19.  Defendant alleges that, "as a small inventor with his own company, it is likely that Mr. Rosheim takes an active part in drafting his patent applications" and "[k]nowledge of NASA's or [General Motors]'s Proprietary Information could aid Mr. Rosheim in the prosecution of his own patents."  Id.; see also id. at 21 ("Mr. Rosheim would not be able to separate what he learns in the litigation from his other knowledge, and he could personally utilize or disclose information gained through access to Proprietary Information, even if only inadvertently.").  Plaintiff does not address defendant's argument directly but states that "NASA has previously public[ly] published CAD drawings of its [Robonaut 2] hand, and its [Robonaut 1] hand, upon which the [Robonaut 2] hand is based.  There is no reason to withhold similar information from Mr. Rosheim." Pl.'s Reply 4.

The law regarding access to protected information by attorneys who are likely to be involved in competitive decision-making is instructive in this case.  In the context of patent cases, a situation often arises in which a trial lawyer privy to confidential information during litigation may also occupy a role in patent prosecution or in otherwise representing clients before the United States Patent and Trademark Office in which such confidential information might provide a competitive edge.  See Deutsche Bank, 605 F.3d at 1377, 1379.  Therefore, protective orders in patent cases typically "include provisions specifying that designated confidential information may be used only for purposes of the current litigation."  Id. at 1378.  Nonetheless, as the Federal Circuit observed in Deutsche Bank, in certain circumstances, "even the most rigorous efforts . . . to preserve confidentiality" may fail because "'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned.'"  Id. (alteration omitted) (quoting FTC v. Exxon Corp., 636 F.2d 1336, 1350 (D.C. Cir. 1980)).  In such circumstances, it may be appropriate for protective orders to effect a patent prosecution bar.  See id. at 1379.

A similar situation may also arise involving in-house counsel and access to confidential information.  See id. at 1378.  For example, in U.S. Steel, the trial court denied access to in-house counsel with respect to certain confidential information, given its determinations that the information was "extremely potent" and that it would be "humanly impossible to control the inadvertent disclosure of some of [the] information in any prolonged working relationship."  U.S. Steel, 730 F.2d at 1466-67 (internal quotation marks omitted).  On appeal, the Federal Circuit vacated the trial court's blanket determination that in-house counsel, by virtue of occupying that general position, should be denied access to such information and held that "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure."  Id. at 1468.  The Federal Circuit further stated that, "[i]n a particular case, e.g., where in-house counsel are involved in competitive decisionmaking, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed."  Id.; see also Deutsche Bank, 605 F.3d at 1378 (stating, with respect to U.S. Steel, "[w]e went on to hold that the counsel-by counsel determination should turn on the extent to which counsel is involved in 'competitive decisionmaking' with its client").

In situations where confidential information disclosed to counsel in the course of litigation may give rise to a later risk of inadvertent disclosure because of the attorney's role in competitive decision-making, the court employs a balancing test, weighing the risk of inadvertent disclosure against the potential harm in denying the opposing party the full benefit of its counsel of choice.  Deutsche Bank, 605 F.3d at 1380 (citing, inter alia, U.S. Steel, 730 F.2d at 1468); see also Levine v. United States, 226 Ct. Cl. 701, 704 (1981) (denying the pro se plaintiff, a patent attorney and holder of multiple patents,

access to protected information in light of his "alleged statements that he might become a competitor[] and his persistent efforts to gain personal access to any claimed confidential materials, rather than contenting himself with access by another attorney representing [him]"); cf. Baystate, 283 F. App'x at 810 ("[I]n determining whether a protective order should be modified, the court must balance the privacy interests of the parties against the public interest in access to discovery information."); Albino, 93 Fed. Cl. at 410.  "In balancing these conflicting interests the [trial] court has broad discretion to determine what degree of protection is required." Deutsche Bank, 605 F.3d at 1380.

　　　As in the situations described in Deutsche Bank and U.S. Steel, plaintiff's Motion in the present case asks the court to decide whether a person who may obtain a competitive advantage from access to proprietary information has a need for access that outweighs the risk of disclosure.  However, unlike those cases, the present case does not involve access for a patent attorney or for in-house counsel at a competitive corporation but for an officer of a competitive corporation--an area that the Federal Circuit has not addressed directly.  Nevertheless, a similar question was before this court in Standard Space, in which the plaintiff company's president and CEO--and co-inventor of the spacecraft-related patents allegedly infringed by the government--sought access to proprietary information.  Standard Space, 35 Fed. Cl. at 508.  The court in Standard Space employed a balancing test, too, weighing the risk of inadvertent disclosure against the harm in barring the plaintiff company's officer from full participation in the litigation.[15]  See id. at 509.  In Standard Space, the plaintiff company had gone out of business at the time of the litigation.  Id.  The president and CEO was no longer active in the company except with respect to the litigation before the court and was employed as an insurance salesman with no future plans for inventing any other spacecraft-related technology.  Id. at 509-10.  It was on this basis that the court granted access to the president and CEO, stating that "defendant has failed to show that there is any greater risk that [the president and CEO] would misuse confidential information as compared to

---

[15] Defendant argues in favor of a similar balancing test, stating that, in determining to what extent confidential information should be disclosed, "a court must balance the need of one litigant to access proprietary information in order to present his case, and the potential that irreparable harm may be suffered by the disclosing party."  See Def.'s Resp. 16 (citing Am. Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 741 (Fed. Cir. 1987) (applying Rule 26(c)(7) of the FRCP, which has since been eliminated), Safe Flight Instrument Corp. v. Sundstrand Data Control Inc., 682 F. Supp. 20, 21-22 (D. Del. 1988) (same), and Rice v. United States, 39 Fed. Cl. 747, 750 (1997) (applying Rule 26(c)(7) of the RCFC, which has since been eliminated)).  The court notes that the balancing test articulated by defendant tracks language of the old Rule 26(c)(7) of the RCFC, which was substantially similar to the old Rule 26(c)(7) of the FRCP, neither of which is currently in force.  See RCFC 26(c) (not containing a subsection (7)); FRCP 26(c) (same).

an aerospace or other technical expert" when "he is no longer active in the aerospace field and simply sells insurance." Id. at 509.

Here, employing a balancing test of the type employed in Standard Space, the court finds that the potential harm of disclosing the requested Proprietary Information to Mr. Rosheim outweighs the need for such disclosure. Cf. id. (weighing the risk of inadvertent disclosure against the harm in barring the plaintiff company's officer from full participation in the litigation). Unlike the officer seeking access in Standard Space, Mr. Rosheim is actively involved in pursuing patents, and, unlike the plaintiff company in Standard Space, Ross-Hime is still in business and led by Mr. Rosheim. See Def.'s Resp. 19; see also Def.'s Sur-Reply 3 ("emphasiz[ing] that Mr. Rosheim should not be entitled to view any [Robonaut 2] proprietary information because he is the principal of a closely held company that does business in the field of robotics, he is an author in the field of robotics, and he is a prolific inventor and patentee with pending patent applications in the field of robotics"); cf. Standard Space, 35 Fed. Cl. at 509-10. This creates a greater risk that Mr. Rosheim may inadvertently misuse confidential information as compared to an aerospace or other technical expert who does not stand to gain a competitive advantage from such information. Cf. Standard Space, 35 Fed. Cl. at 509.

Defendant alleges that such disclosure of non-public Robonaut 2 technology "could negatively impact the value to [General Motors] of its participation in the [joint development] agreement" and could "adversely impact . . . future joint development agreements" because "prospective NASA partners may put less value on jointly developing new technology." Def.'s Resp. 18. Further, defendant appears to suggest that the CAD drawings and photographs at issue represent continuing development of Robonaut 2 technology and states that "continuing development could lead to additional technology that NASA and [General Motors] would like to seek to protect with patents." See Def.'s Resp. 17; cf. Deutsche Bank, 605 F.3d at 1381 (stating that "information related to new inventions and technology under development, especially those that are not already the subject of pending patent applications," is particularly sensitive proprietary information"). Plaintiff does not dispute the potential harms that defendant alleges may result from disclosure of non-public information, except to say that "the drawings do not contain proprietary information" because they "are based on public[ly] disclosed drawings and photographs." Pl.'s Reply 3. Plaintiff also does not allege any specific harm it will face if Mr. Rosheim is not permitted the access sought. Indeed, plaintiff's continued assertion that the information contained in the CAD drawings and photographs at issue has been publicly disclosed belies any argument by plaintiff that it will be harmed by a denial of access. Cf. Def.'s Resp. 25-26 (pointing out this inconsistency in plaintiff's request).

Finally, as defendant asserts, any potential harm to plaintiff is minimized because plaintiff, "th[r]ough its attorneys and independent expert, already has access to all documents produced." Def.'s Sur-Reply 1. Plaintiff's independent expert, Mr. Neils, is the patent attorney who prosecuted the patents-in-suit, and he "has already seen NASA proprietary information when he accompanied counsel for plaintiff" to the inspection of the space hand at ICRA 2012. Def.'s Resp. 23. Defendant does not object to Mr. Neils's accessing Proprietary Information because "Mr. Neils is now retired from the practice of law" and "no longer the member of any state bar"--in other words, Mr. Neils poses a lower risk of inadvertent disclosure than Mr. Rosheim. See id. In addition, Mr. Neils's familiarity with the patents at issue and current involvement in the case suggest that there would be little, if any, harm to plaintiff in having Mr. Neils, rather than Mr. Rosheim, view the disputed Proprietary Information. See id.

Because the court finds that plaintiff's interest in obtaining access for Mr. Rosheim to the Robonaut 2 CAD drawings and photographs created for this litigation and designated as Proprietary Information is outweighed by the potential harm to the government of disclosure, plaintiff's Motion is DENIED with respect to access to properly designated Proprietary Information by Mr. Rosheim. Cf. Baystate, 283 F. App'x at 810; Albino, 93 Fed. Cl. at 410.

B.     Access to Restricted Information:  Mr. Joachim

The information related to Robonaut 2 as to which plaintiff seeks access for Mr. Joachim is designated as both Restricted and Proprietary. See supra Part I. Mr. Joachim would therefore have to have access to both Restricted and Proprietary Information under the Protective Order--or be a "Proprietary Person"--in order to access such information. See Protective Order ¶ 11. Pursuant to the Protective Order, a Proprietary Person allowed access to Restricted Information "must be located in the United States," in addition to being a U.S. citizen or permanent resident.[16]   See id. ¶¶ 12 (stating that a Proprietary Person is a type of "Qualified Person"), 13 ("Each Qualified Person permitted to have access to Restricted Information must be a United States citizen or [permanent resident] and must be located in the United States."). Accordingly, Mr. Joachim, who is located in

---

[16] In support of this requirement, the Protective Order cites 32 C.F.R. § 250.3(a)(1), which applies to a U.S. contractor receiving export-controlled data. See Protective Order ¶ 13 (citing 32 C.F.R. § 250.3(a)(1) (stating that a qualified U.S. contractor must certify that "[t]he individual who will act as recipient of . . . export-controlled technical data on behalf of the U.S. contractor is a U.S. citizen or a [permanent resident] and is located in the United States)). This regulation, although it may be the model for the Protective Order provision, is not relevant to exporting technical data to Mr. Joachim, because he is not receiving export-controlled data on behalf of a U.S. government contractor. Cf. 32 C.F.R. § 250.3(a)(1) (2012).

Canada, see supra Part I, cannot be granted access to the disputed information without an amendment to the Protective Order, cf. Protective Order ¶ 13.

Defendant appears to contest access to the disputed information by Mr. Joachim only to the extent that the information is Restricted Information.  Def.'s Resp. 24-25 ("The United States does not object to Mr. Joachim accessing information under the protective order outside of [the] fact that in order for Mr. Joachim to review the information it appears that the information would need to be exported to Canada."). Plaintiff does not appear to dispute that the information as to which it seeks access for Mr. Joachim is properly designated as Restricted Information.[17]  Thus, the court construes plaintiff's Motion not as a challenge to defendant's Restricted Information designation but as a request to allow Mr. Joachim to be a Proprietary Person--that is, a person with access to both Restricted and Proprietary Information, cf. Protective Order ¶ 11(g) (listing, among the categories of Proprietary Persons, "any other person . . . allowed by the Court"), and a request to amend the Protective Order so that Mr. Joachim may be exempted from the requirement that all Proprietary Persons allowed access to Restricted

---

[17] Defendant states that the "technical data" contained in Robonaut 2 CAD drawings constitutes Restricted Information because export of such data "is controlled by [the Export Administration Regulations (EAR), 15 C.F.R. §§ 730.1-774.1 & supps. (2012)]."  Def.'s Resp. 24; see id. at 2 n.3 ("[Robonaut 1] and [Robonaut 2] CAD drawings are subject to export control under EAR.").  Defendant also states that Robonaut 1 and Robonaut 2 "technology is subject to export control under International Traffic in Arms Regulations (ITAR)," 22 C.F.R. §§ 120.1-130.17 (2012).  Def.'s Resp. 2 n.3; see id. at Ex. I (letter from defendant's counsel to plaintiff's counsel) (asserting that ITAR would be implicated by export of Robonaut 2 CAD drawings to Canada and suggesting in a footnote that the EAR could be implicated as well).  Exports subject to ITAR, however, are not also subject to the EAR.  See supra Part II.C; 15 C.F.R. § 734.3(b)(1)(i) (stating that defense articles subject to ITAR are "exclusively controlled for export" by the Department of State).

The court notes that Robonaut 2 CAD drawings do not appear to be export controlled under ITAR, see 22 C.F.R. § 121.1 (U.S. Munitions list) (not listing robot technology), but are likely subject to the EAR, cf. Def.'s Resp. 3 (stating that "Robonaut hardware is classified under the EAR, Commerce Control List as Export Control Classification Number [(ECCN)] 2B007 'Robots'" (citing 15 C.F.R. pt. 774 supp. 1 (entry for ECCN 2B007, Robots))); 15 C.F.R. pt. 774 supp. 1 (entry for ECCN 2B007, Robots) (stating that "technology for items controlled under" ECCN 2B007, Robots, may be subject to EAR under ECCN 2E001 for "development," 2E002 for "production," or 2E201 for "use").  Therefore, to the extent that the Robonaut 2 accused structure descriptions, drawings and photographs to which plaintiff seeks access for Mr. Joachim require an export license pursuant to the EAR, see supra Part II.C (discussing requirements of EAR), they are properly within the scope of Restricted Information, cf. Protective Order ¶ 7 (stating that Restricted Information includes "information that may not be exported lawfully without approval, authorization, or license").

Information must be located in the United States, see id. ¶¶ 12-13 (requiring Proprietary Persons with access to Restricted Information to be located in the United States); cf. id. ¶ 50 (providing for amendment of the Protective Order by the court).

"[I]n determining whether a protective order should be modified, the court must balance the privacy interests of the parties against the public interest in access to discovery information." Baystate, 283 F. App'x at 810; accord Albino, 93 Fed. Cl. at 410. Here, defendant states that "[t]he United States does not object to Mr. Joachim accessing information under the protective order outside of [the] fact that in order for Mr. Joachim to review the information it appears that the information would need to be exported to Canada." Def.'s Resp. 24-25. Further, defendant represents that "the United States would seek complete compensation from plaintiff for all expenses incurred in procuring an export license for Mr. Joachim absent a compelling reason why only Mr. Joachim could review the documents for plaintiff." Id. at 25; see also Def.'s Sur-Reply 18 (citing, inter alia, Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358 (1978) for the proposition that the court has discretion under FRCP 26(c) to condition discovery on the requesting party's payment of the costs to protect the responding party from undue burden or expense). Plaintiff responds that "any export controls can be accommodated by court order." Pl.'s Reply 7 (capitalization and emphasis omitted).

The court agrees with defendant that the effort and expense of procuring an export license may constitute an undue burden or expense. The court also observes that plaintiff has not articulated a reason why it seeks access for Mr. Joachim, specifically, as distinguished from another draftsman. However, the court is not persuaded that defendant's concerns outweigh plaintiff's interest in having its preferred draftsman review complicated technical information. Because the government has represented that it does not object to Mr. Joachim's accessing the requested information based on its content, see Def.'s Resp. 24-25, the court finds a balancing of the interests weighs in favor of amending the Protective Order to permit access by Mr. Joachim, cf. Baystate, 283 F. App'x at 810; Albino, 93 Fed. Cl. at 410. The court, therefore, amends the Protective Order with respect to paragraph 13, so that it reads:

> Each Qualified Person permitted to have access to Restricted Information must be a United States citizen or person lawfully admitted into the United States for permanent residence and must be located in the United States, except that the court may determine on a case-by-case basis that a United States citizen located abroad may also be a Qualified Person.

The court allows Mr. Joachim to be a Proprietary Person pursuant to paragraph 11 of the Protective Order and, thereby, also to be a Qualified Person pursuant to paragraph 13, as amended, based on the court's determination that a balancing of the interests weighs in favor of access by Mr. Joachim. Accordingly, plaintiff's Motion is GRANTED

with respect to access for Mr. Joachim to Robonaut 2 accused structure descriptions, drawings, and photographs.

IV.     Conclusion

For the reasons stated, plaintiff's Motion is DENIED to the extent that it challenged defendant's Proprietary Information designations, except with respect to Exhibits 18-20 to plaintiff's Reply, as to which the court withholds a decision pending further briefing.  See supra Part III.A.1.  Further, plaintiff's Motion is DENIED with respect to granting Mr. Rosheim access to properly designated Proprietary Information because of his role as a competitive decision-maker for Ross-Hime.  See supra Part III.A.2.  However, with respect to access for Mr. Joachim to Robonaut 2 accused structure descriptions, drawings and photographs, plaintiff's Motion is GRANTED and the Protective Order is amended as provided in Part III.B.

Regarding Exhibits 18-20 to plaintiff's Reply, defendant SHALL file at or before 5:00 p.m. Eastern Daylight Time (EDT) on Monday, March 18, 2013 a supplemental brief addressing when Exhibits 18 and 20 were created, whether each of Exhibits 18-20 was obtained or developed by the NASA Administrator, and whether being subject to public inspection under the Space Act brings the documents to public knowledge within the meaning of paragraph 23 of the Protective Order.  Plaintiff SHALL file a supplemental reply brief at or before 5:00 p.m. EDT on Monday, April 1, 2013.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge